IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ST. ANDREWS PRESBYTERIAN COLLEGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:07CV00640 |
| | ) | |
| THE SOUTHERN ASSOCIATION OF | ) | |
| COLLEGES AND SCHOOLS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM OPINION

Tilley, District Judge

This case arises out of a dispute between Plaintiff St. Andrews Presbyterian College ("St. Andrews" or "the College") and Defendant The Southern Association of Colleges and Schools, Inc. ("SACS" or "the Association"). It is now before the Court on St. Andrews' Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. # 4] and SACS' Motion to Dismiss, or in the Alternative, Motion to Transfer [Doc. # 21]. Each of these motions will be GRANTED in PART: SACS' motion to dismiss will be DENIED; its motion to transfer will be GRANTED. St. Andrews' motion for a preliminary injunction will be GRANTED until the United States District Court for the Northern District of Georgia has an opportunity to determine whether the injunction should be dissolved, altered, or allowed to remain in effect.

The plaintiff, St. Andrews Presbyterian College, is a private institution of higher learning affiliated with the Presbyterian Church and located in Laurinburg, Scotland County, North Carolina. St. Andrews was formed in 1958 by the merger of Flora Macdonald College (founded 1896) and Presbyterian Junior College (founded 1928). St. Andrews has a present enrollment of approximately 800 students. To be eligible for federal U.S. Department of Education (the "Department of Education") grants and for its students to receive student loans guaranteed by the Department of Education, St. Andrews must be accredited by an institution recognized by the Department of Education for that purpose. Without that accreditation, St. Andrews faces the likelihood of having to close.

The defendant, SACS, is recognized by the Department of Education as the regional accrediting body for institutions of higher learning in eleven states, including North Carolina. SACS' decision to withdraw St. Andrews' accreditation and, primarily, the procedures by which that decision was made are the subject of the controversy in this case.

St. Andrews was first accredited by SACS in 1961. In recent years, SACS has expressed concern over St. Andrews' fiscal stability, including violations of

SACS' standards of accreditation [Doc. # 2, Ex. 2], specifically §§ 2.11,[1] 3.10.1[2] & 3.10.4.[3] Together, these standards require governance and control over adequate financial resources.

In April 2005, St. Andrews submitted a report with financial audit information to SACS as part of its regular communications with the Association. [Doc. #2 ¶ 11.] In June 2005, St. Andrews was placed on "Warning" for non-compliance with SACS' standards of accreditation. [Doc. #2 ¶ 11.] A Special Committee from SACS visited the College from October 31 through November 1, 2005, and prepared a report of the visit. [Doc. #2 ¶ 12.] In December 2005, St. Andrews was placed on "Probation" for twelve months. [Doc. # 2 ¶ 13.] A second Special Committee visited the College from October 30 through November 1, 2006, and prepared a report of the visit. [Doc. # 2 ¶ 14.] In January 2007, St. Andrews was placed on "Probation" for an additional six months. [Doc. # 2 ¶ 15.] A final Special Committee visited the College on May 24, 2007, and, again,

---

[1]Section 2.11 states, in part: "The institution has a sound financial base, demonstrated financial stability, and adequate physical resources to support the mission of the institution and the scope of its programs and services." The

remainder of § 2.11 lists the requisite financial statements and audit information for SACS' accreditation process.

[2]Section 3.10.1 states: "The institution's recent financial history demonstrates financial stability."

[3]Section 3.10.4 states: "The institution exercises appropriate control over all its financial and physical resources."

3

prepared a report of the visit.  [Doc. # 2 ¶ 21-22.]

Based on information that had been gathered by SACS, the final Special Committee report, and testimony at a hearing on June 19, 2007, the Committee on Compliance and Reports ("C&R Committee") recommended the removal of St. Andrews from membership with SACS. [Doc. # 2 ¶ 31.]  On June 21, 2007, the Commission on Colleges (the "Commission") upheld the recommendation to remove St. Andrews from membership.[4]  [Doc. # 2 ¶ 31.]  St. Andrews submitted a timely appeal, which was denied by an Appeals Committee on August 23, 2007. [Doc. # 2 ¶ 32.]

Having exhausted the appeals remedies available through the Association's procedures, St. Andrews filed the present case against SACS on August 24, 2007, alleging violations of SACS' own procedures, common law due process, constitutional due process, and the Higher Education Act of 1965, 20 U.S.C. § 1099b [Doc. # 2].  St. Andrews seeks injunctive relief and alleges damages in excess of $1,000,000.00.  Also on August 24, 2007, St. Andrews filed its Emergency Motion for the Issuance of a Temporary Restraining Order and Preliminary Injunction [Doc. #4].  On August 28, 2007, SACS filed a Motion to Dismiss, or in the Alternative, Motion to Transfer [Doc. # 21].  Upon stipulation of

---

[4]The C&R Committee recommends a decision to the Executive Council, who then makes a final recommendation to the Commission.  In this case each decisionmaking body affirmed the original recommendation of the C&R Committee to remove St. Andrews from membership.

4

the parties, a Temporary Restraining Order [Doc. # 32] was entered on August 30, 2007, to reinstate St. Andrews' membership in SACS until further order of the Court. The motions for a preliminary injunction and to transfer are discussed below.

## II.

A preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (internal quotations omitted). The standard for a preliminary injunction is a hardship balancing test of four factors: "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." Id. at 812; see also Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 194 (4th Cir. 1977) (first establishing the hardship balancing test for preliminary injunctions in the Fourth Circuit).

The first two factors, which balance the relative harms, are the "most important." Direx Israel, 952 F.2d at 812. The Fourth Circuit applies this balancing test with a sliding scale approach, so that if the balance of harms in the first two factors "tips decidedly" in favor of the plaintiff, then "a preliminary

5

injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991) (quoting Blackwelder Furniture, 550 F.2d at 195).

On the facts of this case, the balance of preliminary injunction factors weighs in favor of granting St. Andrews injunctive relief. First, St. Andrews faces immediate irreparable harm. Sixty-seven percent of St. Andrews' students are on federal financial aid. If St. Andrews were to be stripped of its accreditation, those students would not receive federal aid, and without a preliminary injunction the College will "be forced to close." [Doc. # 5 at 3.] Second, the relative likelihood of harm to SACS is slight. The harm to SACS is tied to its credibility among member institutions and its ability to enforce the Association's decisions.

Because the balance of the first two factors tips decidedly in favor of St. Andrews, the College need only show that it has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. Because the Court finds St. Andrews has raised sufficient questions going to the merits for its common law due process claim, there is no need to consider the claims under the Higher Education Act and Fifth Amendment due process.

A.

6

The Court will apply federal law to determine whether St. Andrews has a cause of action under common law due process.[5]  See Chicago Sch. of Automatic Transmission, Inc. v. Accreditation Alliance of Career Schs. and Colleges, 44 F.3d 447, 449 (7th Cir. 1994) (determining that federal, rather than state, law applies in school accreditation cases because Congress granted federal courts exclusive jurisdiction over these cases in the Higher Education Act, 20 U.S.C. § 1099b(f) and applying the standard of review found in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)); see also Auburn Univ. v. Southern Ass'n of Colleges and Schools, Inc., 489 F. Supp. 2d 1362, 1370 (N.D. Ga. 2002) (acknowledging that the "application of 'common law due process' parallels judicial review in administrative law").

Judicial review is limited in the school accreditation setting because the accrediting association is given great deference.  Id.  Courts have applied the notion of common law due process and have conducted a limited judicial review in the school accreditation setting.  See, e.g., Wilfred Academy of Hair and Beauty Culture v. Southern Ass'n of Colleges and Schools, 957 F.2d 210 (5th Cir. 1992) (limiting review to whether the defendant "acted arbitrarily or unreasonably in light

---

[5]The Fourth Circuit has not addressed the issues of due process in the school accreditation setting or "common law due process" in any setting.  For a summary of the history and development of common law due process in the school accreditation setting, including its application in the First, Fifth, Eighth, Eleventh, and D.C. Circuits, see generally Auburn Univ. v. Southern Ass'n of Colleges and Schools, Inc., 489 F. Supp. 2d 1362, 1367-74 (N.D. Ga. 2002).

7

of its policies") (internal quotations omitted); <u>Auburn Univ.</u>, 489 F. Supp. 2d at 1370 (focusing review "primarily on whether the accrediting body's internal rules provide a fair and impartial procedure and whether it has followed its rules in reaching its decision") (internal citations and quotations omitted); <u>Parsons College v. North Central Ass'n of Colleges and Secondary Schools</u>, 271 F. Supp. 65, 73 (N.D. Ill. 1967) (limiting review to whether the decision to remove an institution from membership was "arbitrary and unreasonable" and "supported by substantial evidence").

B.

Notice and an opportunity to be heard are the essentials of common law due process. <u>See</u> <u>Auburn Univ.</u>, 489 F. Supp. 2d at 1373-74. SACS' accreditation procedures have previously raised common law due process concerns. For example, the Department of Education has recommended that SACS "address the Department's concerns pertaining to the time it affords an institution to comply with requests for information and documents, the administrative record, cost of appeal, etc., to demonstrate that the procedures it uses throughout the accrediting process satisfy due process." [Doc. # 2, Ex. 1 at 3.] Although there may be other common law due process concerns in the instant case, the Court will focus on the time restrictions St. Andrews faced during its procedures before the Association's C&R Committee and the limited nature of the Association's appellate process.

8

1.

St. Andrews argues that the C&R Committee proceedings violate common law due process. After two years of communications between St. Andrews and SACS, which included the filing of financial paperwork, three separate Special Committee visits to the St. Andrews campus, and Commission decisions to place St. Andrews first on Warning and then on Probation, St. Andrews ultimately was called before the C&R Committee. It was the C&R Committee that made the first recommendation to withdraw St. Andrews from membership with SACS.[6]

C&R Committees are standing committees of the Commission that are responsible for reviewing materials submitted by member institutions and acting on the accreditation of institutions. Their purpose is ultimately to provide recommendations for Commission action. A typical C&R Committee is comprised of a chair who presides at meetings, other Commission members who are not also members of the Executive Council, and as many as five non-Commission members who may be appointed based on their special expertise. Commission members are volunteer representatives from member institutions, and they typically hold leadership positions at their respective colleges and schools.[7]

--------

[6]The C&R Committee makes an initial recommendation to the Executive Committee, which, in turn, makes a final recommendation to the Commission. [Doc. # 2 ¶¶ 26-27.]

[7]For example, the current North Carolina Commission members include five college presidents, a director, chancellor, associate professor, and senior vice president.

9

St. Andrews raises two main arguments that procedures before the C&R Committee were violative of common law due process. First, due to time constraints and SACS' requirement that all written evidence and argument must be submitted at least ten business days prior to the hearing to be included in the record prepared for C&R Committee members' review, St. Andrews was unable to submit a written brief or written evidence to the C&R Committee in response to the Special Committee report before the hearing. Second, St. Andrews was unable to have a meaningful hearing before the C&R Committee because of regulations limiting the amount of time for the College's arguments.

The C&R Committees meet twice a year and conduct all of their business at the biannual meetings. [See Doc. # 54 at 22-23.] At the June 2007 meeting, the C&R Committee that heard the St. Andrews matter also heard approximately 75 to 100 additional matters in three days of meetings. [See Doc. # 55 at 26, 64.] The St. Andrews record was approximately 500 pages. [See Doc. # 55 at 26-27, 64.] Submissions to the St. Andrews record had to be made ten days prior to the hearing. Thus, the C&R Committee had a brief period of time to review written materials provided by the final Special Committee, and no opportunity to review a response from St. Andrews, prior to the hearing on June 19, 2007. [See Doc. # 2, Ex. 7 at 2.]

However brief the time C&R Committee members had to review materials prior to the biannual meeting, St. Andrews contends it would have submitted a

10

written response to the Special Committee report if it had been given enough time to do so. St. Andrews was emailed a copy of the Special Committee report on June 4, 2007, and received a hard copy on either June 9 or 10, 2007. [Doc. # 54 at 118.] However, St. Andrews was told by the President of the Commission, Dr. Belle Wheelan, that any written response to the Special Committee report was due ten business days before the C&R hearing, or by June 5, 2007. [See Doc. # 2, Ex. 7 at 2.] St. Andrews would have had only one day to read and digest the Special Committee report and then compile and draft a written response after it received the Special Committee report via email on June 4, 2007.

This compressed time line of events leading up to the C&R Committee hearing hampered St. Andrews' ability to respond to the Special Committee report to correct any errors or present counter-arguments and evidence. For example, the Special Committee report was based on draft financial numbers; St. Andrews did not have the opportunity to update those numbers in writing to reflect the final audit numbers for the C&R Committee to review before the hearing. [Doc. # 54 at 118.] Specifically, the final audit information for the operational deficit, the cash flow deficit, unrestricted giving, and the debt level increase was more favorable to St. Andrews than the Special Committee had reported to the C&R Committee. The Special Committee reported that the operational deficit was $767,491 (audit was lower, $569,117), the cash flow deficit was $730,815 (audit was lower, $169,441), unrestricted gifts totaled $2,167,515 (audit was higher, $2,259,756),

11

and the debt level increased $725,484 (audit was lower, $113,486). [Doc. # 54 at 144-47.] Additionally, the Special Committee report registered concern about St. Andrews' ability to raise funds to retire debt, and the College would have responded with information about its past history of unrestricted fund-raising. [Doc. # 54 at 149-50.]

St. Andrews argues that it also would have responded in writing to the Special Committee's interpretation of the consolidated financial index ratio, fund-raising analysis, and enrollment data. [Doc. # 54 at 125-27.] Specifically, the Special Committee reported that the College's enrollment yield, or the percentage of applicants who were admitted and ultimately enrolled, had showed a "steady decline," but President Baldasare of St. Andrews testified that "enrollment has steadily grown almost over 32 percent in four years." [Doc. # 54 at 147-49.] St. Andrews also would have updated information about its enrollment management plan by including information about tuition increases and by providing illustrative examples of its interest driven portals, which were areas of concern during the Special Committee's visit. [Doc. # 54 at 121-22, 127.] Specifically, the Special Committee had reported that "needs assessment, costs projections and potential program profitability was notably absent," when, in fact, President Baldasare testified that exact information was provided to the Special Committee during its campus visit. [Doc. # 54 at 150.] The College would have helped interpret information provided to the Special Committee about instructional expenses as a

12

whole, particularly by isolating the athletic and equestrian programs' expenses to reveal expenditures and revenues associated with non-athletic instruction. [Doc. # 54 at 123.] St. Andrews also wanted to follow up with additional information about the equestrian program in response to questions asked by the Special Committee during its final campus visit. [Doc. # 54 at 124.]

In addition to the compressed time line, the cursory nature of the C&R Committee hearing could also be a violation of common law due process. President Paul Baldasare was given only ten minutes to make introductory remarks at the C&R Committee hearing, and then the C&R Committee asked President Baldasare and other St. Andrews representatives questions for the remaining thirty minutes. [See Doc. # 54 at 23; Doc. # 2, Ex. 10 at 2.] After making introductory remarks, St. Andrews had no opportunity to provide corrections or clarifications unless it was in response to a question by the committee, even if, for example, the C&R Committee was relying on inaccurate or misleading information. Given the voluminous record, the limited amount of time for volunteer C&R Committee members to review that record prior to the C&R Committee hearing, and the large number of matters each C&R Committee is required to decide at each biannual meeting, oral testimony is necessarily emphasized in the C&R Committee's decisionmaking process. The combination of increased emphasis on oral testimony and limited time allotted for the hearing creates due process concerns regarding whether St. Andrews had a meaningful opportunity to be heard.

13

St. Andrews argues that the limited nature of the appellate process also violates common law due process. First, the College was unable to submit any new information to the Appeals Committee after the C&R Committee hearing, including information about $4.1 million dollars in unrestricted gifts received by or pledged to the college after the C&R Committee hearing. [Doc. # 54 at 120.] Additionally, one of St. Andrews' major lenders agreed to reduce the College's indebtedness by $3 million after the C&R Committee hearing, and the College was

unable to submit this information for consideration by the Appeals Committee. [Doc. # 54 at 121.]

Second, the College was unable to correct any incorrect information considered by the Appeals Committee and could not cross-examine any witnesses. [Doc. # 2, Ex. 16 at 6.] For example, the transcript for the appeals hearing reveals that an Appeals Committee member, Dr. Harold Preston, discussed St. Andrews' cash flow deficit as $1.69 million when in actuality it was only $169,000. [Doc. # 33 at 87; see Doc. # 54 at 134.] While this mistake was later determined to be a transcription error [see Doc. # 44 ¶ 3], the mere possibility that such an egregious error could be made at the Appeals Committee hearing, and that St. Andrews would have no opportunity to correct it, raises serious due process concerns.

Because the preliminary injunction factors which balance the harms to St.

Andrews and to SACS tips decidedly in favor of St. Andrews and St. Andrews has raised questions going to the merits of the College's common law due process claim so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation, St. Andrews' motion for a preliminary injunction [Doc. # 4] will be GRANTED until the United States District Court for the Northern District of Georgia has an opportunity to determine whether the injunction should be dissolved, altered, or allowed to remain in effect.

III.

Under 28 U.S.C. § 1404(a), a district court may transfer a civil action to another district court "for the convenience of parties and witnesses" if it might have originally been brought there. The district court has discretion to adjudicate a motion to transfer venue by an "individualized, case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)).

SACS moves this Court to transfer the matter to the United States District Court for the Northern District of Georgia. SACS bases its argument on the validity and enforceability of a forum selection clause located after a choice of law provision in the SACS By-laws, which states:

> As a condition of receiving any status with a Commission,
> each institution concedes that all agreements created by

15

the respective Commission's granting such status shall be deemed to have been entered into in DeKalb County, Georgia, and shall be interpreted in accordance with the laws of the State of Georgia. Further, each institution agrees that jurisdiction and venue for any action which might arise from any membership agreement between the institution and the Commission, regardless of which party shall initiate the action, shall be exclusively in the United States District Court for the Northern District of Georgia or the state courts of DeKalb County, Georgia, whichever of these courts shall have proper subject matter jurisdiction.

St. Andrews contends the following:(1) the forum selection clause does not apply because the College is no longer a member of SACS; (2) St. Andrews did not receive notice of the forum selection clause; (3) the forum selection clause is against North Carolina public policy, specifically N.C. Gen. Stat. § 22B-3 (rendering contracts entered into in North Carolina void if they require prosecution or arbitration in another state); (4) the forum selection clause is unreasonable and a product of unequal bargaining power and overreaching; (5) the forum selection clause is a contract of adhesion; and (6) transfer of venue is inappropriate.

A.

In the Fourth Circuit, a forum selection clause is presumptively valid. <u>Allen v. Lloyd's of London</u>, 94 F.3d 923, 928 (4th Cir. 1996) (citing <u>Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 9 (1972)). However, that presumption may be overcome by a clear showing by the non-moving party that the clause is unreasonable under the circumstances. Unreasonableness may be found in four ways: (1) formation was induced by fraud or overreaching; (2) the non-moving

16

party "will for all practical purposes be deprived of his day in court" because of grave inconvenience or unfairness of the selected forum; (3) fundamental unfairness of the chosen law may deprive the non-moving party of a remedy; or (4) enforcement would contravene a strong public policy of the forum state.  Id. (citing Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991)).

St. Andrews contends that the forum selection clause was formed by overreaching and that enforcement contravenes North Carolina public policy. St. Andrews cites Dove Air, Inc. v. Bennet, 226 F. Supp. 2d 771 (W.D.N.C. 2002), as an analogous example of overreaching.  However, the facts of that case are decidedly different.  In Dove Air, the plaintiff successfully proved overreaching with the following facts: the joint venture agreement was wholly one-sided, written by the defendant, and gave the defendant sole authority to accept or reject purchases; the plaintiff had no authority to bind the defendant; the plaintiff was reimbursed only for pre-approved purchases; all accounting of the plaintiff's operations were to be done by the defendant; the plaintiff had to indemnify the defendant (with no reciprocal agreement); and a one-sided non-compete clause prohibited the plaintiff from competing but allowed the defendant to transact business with others.  Id. at 774.  Additionally, the defendant knew the plaintiff was experiencing severe financial problems at they time entered into the joint venture agreement.  Id.

Here, SACS distributed the forum selection clause to member institutions

17

prior to its adoption at a December 1994 meeting. Members adopted the by-laws for their own benefit, by democratic vote. At that time, St. Andrews had not been cited by SACS for non-compliance for any reason, including financial instability. Presumably, as a member institution, St. Andrews voted, or had the power to vote, on the adoption of the by-laws. St. Andrews argues that it had no bargaining power with SACS. However, there is no evidence that St. Andrews had a lesser voice or choice than any other member institution with regard to whether or not to adopt the forum selection clause. Additionally, the by-laws were not between St. Andrews and SACS, but were between and among all member institutions. Therefore, there is insufficient evidence in the record to support a determination that the forum selection clause was entered into by fraud or overreaching.

St. Andrews also argues that the forum selection clause contravenes North Carolina public policy, specifically N.C. Gen. Stat. § 22B-3, which states: "[A]ny provision in a contract <u>entered into in North Carolina</u> that requires the prosecution of any action . . . that arises from the contract to be instituted or heard in another state is against public policy and is void and unenforceable." (emphasis added.) St. Andrews' public policy argument is dependent upon the forum selection clause being entered into in North Carolina. However, the plain language of the By-laws states: "all agreements . . . shall be deemed to have been entered into in DeKalb County, Georgia, and shall be interpreted in accordance with the laws of the State

18

of Georgia." Under North Carolina's choice-of-law rules, such contractual provisions are given effect. See Key Motorsports, Inc. v. Speedvision Network, L.L.C., 40 F. Supp. 2d 344, 346 (M.D.N.C. 1999). Since the forum selection clause was entered into in Georgia, the North Carolina statute, and its corresponding public policy against out-of-state forum selection, does not apply.

The forum selection clause is valid because there is insufficient evidence of overreaching and the clause does not violate public policy.


B.

While the forum selection clause "will be a significant factor that figures centrally in the district court's calculus," Stewart Org., 487 U.S. at 29, the Court will weigh the forum selection clause along with many other factors in deciding whether to transfer a case pursuant to 28 U.S.C. § 1404. See Rice v. Bellsouth Adver. & Publ. Corp., 240 F. Supp. 2d 526, 528 (W.D.N.C. 2002). Those other factors include "the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'" Stewart Org., 487 U.S. at 30. Specifically, those factors are: (1) the plaintiff's choice of forum; (2) the residence of the parties; (3) the relative ease of access of proof; (4) the availability of compulsory process for attendance of witnesses and the costs of obtaining

19

attendance of willing witnesses; (5) the possibility of a view; (6) the enforceability of a judgment, if obtained; (7) the relative advantages and obstacles to a fair trial; (8) other practical problems that make a trial easy, expeditious, and inexpensive; (9) the administrative difficulties of court congestion; (10) the interest in having localized controversies settled at home and the appropriateness in having the trial of a diversity case in a forum that is the home with the state law that must govern the action; and (11) the avoidance of unnecessary problems with conflict of laws. Rice, 240 F. Supp. 2d at 529 (citation omitted). Furthermore, "[i]t is conceivable in a particular case, for example, that because of these factors a district court acting under § 1404(a) would refuse to transfer a case notwithstanding the counterweight of a forum-selection clause . . . ." Stewart Org., Inc., 376 U.S. at 30-31.

SACS contends that the forum selection clause is valid and enforceable and none of the other factors outweigh the forum selection clause; therefore, this action should be transferred to the United States District Court for the Northern District of Georgia. Specifically, SACS contends that many of the additional factors do not point strongly to the Middle District of North Carolina over the Northern District of Georgia. Applying the first factor as an example, St. Andrews chose to file this action in the Middle District of North Carolina, but the College also "chose" the Northern District of Georgia as the appropriate federal court in the forum selection clause. Other factors, such as the relative ease of access of

20

proof (the third factor) and the relative advantages and obstacles to a fair trial (the seventh factor), point just as strongly to the Northern District of Georgia as to the Middle District of North Carolina. Regardless of the location of the court, witnesses and documents will have to travel to either North Carolina or Georgia. While SACS admits that there is a localized interest in having the case heard in North Carolina, it also points to the need for developing a clear body of law in one court system for all SACS' accreditation cases.

St. Andrews contends that the first, second, third, eighth, and tenth factors all weigh in favor of not transferring this action to the United States District Court for the Northern District of Georgia pursuant to the forum selection clause. Specifically, St. Andrews chose to file this action in the United States District Court for the Middle District of North Carolina. Additionally, St. Andrews and its employees and students are located in North Carolina, whereas SACS' members are throughout an eleven-state region. The College's financial records and many witnesses also live in North Carolina, which would make it easier and less expensive for St. Andrews to continue trying the case in North Carolina. Finally, St. Andrews argues there is a strong local interest in having the dispute resolved here in North Carolina.

While some of the factors advanced by St. Andrews arguably could weigh in favor of not transferring this action, their weight is not greater than the weight of the valid and enforceable forum selection clause. Therefore, SACS' Motion to

21

Transfer [Doc. # 21] will be GRANTED and this action will be transferred to the United States District Court for the Northern District of Georgia.

V.

For the foregoing reasons, St. Andrews' Motion for a Preliminary Injunction [Doc. # 4] will be GRANTED and SACS' Motion to Dismiss, or in the Alternative, Motion to Transfer [Doc. # 21] will be GRANTED in PART and DENIED in PART.

This the day of November 29, 2007

   /s/ N. Carlton Tilley, Jr.  
United States District Judge
